Dale F. Meyer,                                    Civ. No. 09-3205 (MJD/LIB)

                Plaintiff,

v.                                                **REPORT AND**
                                                  **RECOMMENDATION**

Michael J. Astrue, Commissioner
of the Social Security Administration,

                Defendant.

## I.        INTRODUCTION

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), Plaintiff Dale F. Meyer seeks judicial review of the final decision of the Commissioner of Social Security denying Plaintiff's application for disability insurance benefits (DIB) and supplemental security income (SSI).  The parties have filed cross-motions for summary judgment, which have been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

For the reasons stated below, the Court recommends that Plaintiff's motion for summary judgment be granted in part, and that the Commissioner's motion be denied.

## II.       PROCEDURAL HISTORY

Plaintiff filed an application for DIB and SSI on August 31, 2007, alleging that he had become disabled on August 27, 2007. (T. 11, 110-118).  He met the insured status requirement on the alleged onset date, and he remains in an insured status through December 31, 2011. (T. 159).  Plaintiff's claim was denied on initial review on October 1, 2007 (T. 11, 51-53), and upon

reconsideration on January 11, 2008 (T. 61-71). Thereafter, ALJ George Gaffaney held a hearing on December 12, 2008, at Plaintiff's request (T. 11, 19-45), and on January 6, 2009, ALJ Gaffaney issued an unfavorable decision. (T. 8-18). The Appeals Council denied Plaintiff's request for review on September 22, 2009. (T. 1-3, 6). Consequently, the ALJ's decision became the final decision of the Commissioner for purposes of judicial review. See, Grissom v. Barnhart, 416 F.3d 834, 836 (8th Cir. 2005).

## III.    FACTUAL BACKGROUND

Plaintiff was 42 years old on the alleged onset date. (T. 17, 46). He has a high school education and has worked as a bus driver and a bellhop. (T. 165, 169, 222). Plaintiff alleges that he has been unable to work since he suffered a back injury during a car accident on August 27, 2007.

Medical records show that Plaintiff was treated in the emergency room at Fairview Red Wing Hospital following the car accident, at which time Plaintiff complained of pain in his lower back and neck. (T. 235-236). X-rays and CT scans were negative (T. 238-242), and following an examination, Plaintiff was diagnosed with a lumbar sprain, and discharged with prescriptions for ibuprofen and vicodin. (T. 236, 243). The next day, Plaintiff was seen by Marc Bettich, M.D., who is Plaintiff' primary care physician, for a follow-up visit. (T. 225-226). Plaintiff stated that he was still experiencing pain across his lower back. (T. 225). Dr. Bettich observed no tenderness along the spine or bruising, but noted tenderness and tightness in the lumbar musculature. (T. 226). He substituted percocet for the vicodin, continued the ibuprofen, and prescribed soma for muscle spasms. (Id.)

In September of 2007, Plaintiff continued to seek treatment for his lower back pain. (T. 225). At that time, Plaintiff reported that his back pain had not improved and may have become worse. (Id.) Dr. Bettich observed that he was ambulating hunched over, and that his lumbar musculature was tighter. (Id.) Dr. Bettich referred Plaintiff to physical therapy and orthopedics. (T. 225, 278). He continued Plaintiff's current medications. (Id.) In September, Plaintiff began seeing a physical therapist and using a TENS unit. (T. 301-309). At his initial consultation, Plaintiff presented with continued low back pain, numbness, and a limited ability to perform daily living activities. (T. 306).

On October 8, 2007, Plaintiff saw Matthew Eich, M.D., for an orthopedic consultation. (T. 276-277). Dr. Eich observed that Plaintiff presented with "very guarded motion and a forward flexed posture with a wheeled walker," and that he appeared to be in "significant distress." (Id.) Plaintiff reported that he continued to have "a great deal of difficulty getting about," and that he was taking ibuprofen and a muscle relaxer, which alleviated but did not eliminate the pain. (Id.). Plaintiff complained of increased pain during prolonged sitting and standing, and when rolling over in bed. (Id.). In order to further assess Plaintiff's condition, Dr. Eich ordered an MRI scan. (Id.) After reviewing the MRI results, Dr. Eich concluded that Plaintiff had a disc protrusion at the T7-8 level, with smaller abnormalities noted at the T4-5 and T6-7 level. (T. 275).

During October and November of 2007, Plaintiff's pain continued. He continued to use a walker and presented with an antalgic gait. (T. 275-277). It was noted that he was unable to return to work due to the severity of his symptoms. (T. 275). Dr. Eich diagnosed Plaintiff with an "[i]ncapacitating thoracic disc syndrome." (Id.) In November, Dr. Eich described Plaintiff's condition as a disc herniation, and noted that a thoracic epidural treatment had been ineffective.

(Id.) Because Plaintiff's pain had not subsided, he recommended that Plaintiff see a spine surgeon specializing in "thoracic disc investigation and intervention." (Id.)

As noted, Plaintiff started physical therapy treatment in September 2007, which he continued throughout the fall of 2007. (T. 293-309). On November 13, 2007, Physical Therapist Emily Flaaen stated that Plaintiff had been unable to meet physical therapy goals because he was having difficulty getting his pain under control. (T. 293).

On November 16, 2007, the Plaintiff was seen by Kevin J. Mullaney, M.D., for a surgical consultation. (T. 342-344). Dr. Mullaney stated that Plaintiff's pain was "significant and debilitating at the lumbar and thoracolumbar regions," but that Plaintiff denied any radiating leg pain or progressive weakness. (T. 342). Dr. Mullaney noted that Plaintiff's pain was exacerbated by bending, lifting, and twisting and that his pain improved while he was lying down. (Id.) After a physical examination, Dr. Mullaney noted that Plaintiff was "quite debilitated with gait" and that he required the use of a walker. (T. 343). He observed difficulties when Plaintiff attempted arise to an erect position. (Id.) Based on the October MRI, Dr. Mullaney noted "mild disc protrusions at T4-5, T6-7, and T7-8 . . . and mild degenerative changes." (Id.)

After an examination and assessment, Dr. Mullaney recommended another MRI and a CT scan of the lumbar spine in order to further evaluate Plaintiff for the presence of a ligamentous injury, disc herniation, or a fracture. (T. 343). Dr. Mullaney reported that Plaintiff appeared to be "extremely straightforward," and therefore concluded that he exhibited no signs of symptom amplification. (T. 343). After reviewing the results of MRI and CT scans, Dr. Mullaney observed that there was no evidence of a tumor, fracture, infection, or ligamentous instability.

(T. 345).  Dr. Mullaney further observed "disc degeneration particularly at the L5-S1 level with a small right parasagittal protrusion contacting the S1 nerve root", and foraminal stenosis at multiple points that was "mild in nature."  (Id.)  Dr. Mullaney concluded that there was no surgical option available, and reported his belief that Plaintiff's condition would "improve with time and physical therapy and anti-inflammatories."  (Id.)

On January 3, 2008, Plaintiff was seen by Dr. Eich for a follow-up visit regarding the treatment of his thoracic disc syndrome.  (T. 391-392).  At that time, Plaintiff was still experiencing an uncomfortable level of thoracolumbar back pain.  (Id.)  At that time, Plaintiff was attending physical therapy twice weekly, as well as doing a home therapy program.  (Id.)  Plaintiff also reported continued use of a walker.  (Id.)  Dr. Eich advised Plaintiff to attempt discontinuing his use of his walker, to continue aggressively with his physical therapy program, to lose some weight, and to work on a conditioning and strengthening program.  (Id.)

Plaintiff continued to attend physical therapy through February of 2008, and over this period of time Plaintiff reported a decrease in pain levels.  (T. 370-384).  In September through November of 2007, Plaintiff was consistently reporting his pain at a level of seven to nine out of ten on a ten point scale.  (T. 312-15, 317-20, 323-324).  Plaintiff's therapy records indicate that by February of 2008, he was reporting a decrease in pain levels over a period of months.  (T. 370). ("Patient reports a current pain level of 3/10 compared to 9/10 at the start of care.  Patient reports a(n) unrated improvement in symptoms since start of care."); (T. 371-384).  On February 13, 2008, Physical Therapist Katrina B. Hines concluded that Plaintiff no longer needed skilled physical therapy treatment, and as a consequence, Plaintiff was discharged from the skilled physical therapy program.  (T. 370).  Plaintiff was to continue his program independently at

home.  (Id.)  Hines went on to advise that most of his goals, which included bed mobility and independent ambulation, had been partially met.  (T. 370-371.)

On March 31, 2008, Dr. Eich reported that Plaintiff continued to experience significant back pain related to thoracic disc syndrome of the lumbosacral discs, stating that Plaintiff "has not had any dramatic change or improvement in the situation."  (T. 389).  Dr. Eich explained that Plaintiff's attempts to reduce or eliminate his use of ibuprofen and muscle relaxers were unsuccessful, as Plaintiff's symptoms increased.  (Id.)  Although other medications and treatments were discussed, Dr. Eich believed that Plaintiff's current regime was a reasonable compromise with the least amount of side effects.  (Id.)  Dr. Eich concluded Plaintiff had "sustained a permanent injury from the motor vehicle accident," but he nevertheless hoped Plaintiff's condition would improve over time.  (Id.)

In June of 2008, Dr. Eich again found that Plaintiff's condition was basically unchanged.  (T. 396).  Dr. Eich reported that Plaintiff had attempted to reduce his medication, but he was unable to function without the medications.  (Id.)  Dr. Eich reported that Plaintiff would continue with physical therapy, ibuprofen and the muscle relaxants.  (Id.)

In July of 2008, Plaintiff reported an increase in pain, at which time Dr. Bettich noted that Plaintiff had a history of chronic pain since the car accident.  (T. 397).  Dr. Bettich directed Plaintiff to continue taking ibuprofen, to decrease his use of soma, and to start taking percocet as needed.  (T. 396).

Plaintiff saw Dr. Bettich again on September 30, 2008, for his chronic back pain.  (T. 393).  Plaintiff continued to take ibuprofen, soma, and percocet for pain.  (Id.)  Dr. Bettich stated

that Plaintiff had been unable to cease use of narcotics and muscle relaxants due to a marked increase in pain. (T. 393-394).

## IV.    MEDICAL OPINIONS

On September 28, 2007, or approximately one month after the accident, Gregory H. Salmi, M.D., a state agency physician, assessed Plaintiff's claim of disability. (T. 267-269). Dr. Salmi noted that Plaintiff alleged a back injury that was causing non-radiating pain across the lower back. (T. 268). Dr. Salmi found that Plaintiff experienced a minimal loss of range of motion, and that Plaintiff had not offered any x-rays of his lower back. (Id.) Dr. Salmi concluded that Plaintiff had suffered "a very mild back strain or soft tissue injury." (Id.)

On December 11, 2007, Dr. Eich completed an assessment of Plaintiff's residual functional capacity (RFC), at which time he advised that Plaintiff had been diagnosed with a disc herniation and that his prognosis was guarded. (T. 346-352). Dr. Eich advised that Plaintiff's subjective symptoms were consistent with his diagnosis, and that his impairments were expected to last at least twelve months. (T. 346). According to Dr. Eich, Plaintiff's symptoms and medication side effects would frequently (i.e., up to 75 percent of the day) interfere with his attention and concentration, and in his opinion, Plaintiff was incapable of even low stress work. (T. 347). Dr. Eich stated that work activity would increase Plaintiff's pain and discomfort, and that Plaintiff would be unable to maintain persistence and pace in order to engage in competitive employment based upon a five-day, eight-hour per day, work schedule. (T. 348). Dr. Eich further reported that Plaintiff's symptoms moderately affected his ability to perform daily living activities; that he was able to walk less than one block; that he could sit for one hour; that he could stand for 30 minutes; that he needed to change his position every 20 to 30 minutes; that he

could never twist, climb, or crawl; that he could perform a minimal amount of bending, pulling, and walking up an incline; that he could occasionally stoop, kneel, crouch, reach, push, perform overhead work, and rotate his neck; and that he could frequently perform both fine and firm grasping with his hands. (T. 348-350). Subsequently, in a letter dated November 17, 2008, Dr. Eich stated that it was his opinion that Plaintiff suffered from a thoracic disc injury or thoracic disc syndrome. (T. 405-406). Dr. Eich further stated:

> "Mr. Meyer has not had any significant improvement in spite of attempted time, treatment and intervention in over one year. To that end I believe that the condition would be considered permanent.
>
> I believe Mr. Meyer will need to continue on some type of antiinflammatory medication and finds that ibuprofen has been most efficacious. Due to the severe side effects of the intervention for epidural, He is not considered a candidate for repeating this. He is not considered a surgical candidate.
>
> I believe Mr. Meyer would have to limit his activities to avoid repetitive flexion, extension and rotation of the spine. I would avoid exposure to heavy vibration and jarring activities or overhead work activities."

(T. 406).

On January 10, 2008, Howard Atkin, M.D., who is a stage agency physician, reassessed Plaintiff's RFC. (T. 354-364). Dr. Atkin noted that Plaintiff had been diagnosed with a multilevel degenerative disc injury of the lumbosacral and thoracic spine, which had been documented by an MRI and CT scan. (T. 356). Dr. Atkin observed that Plaintiff had been ambulating with a walker, and that he was receiving ultrasound treatments and taking prescription medications for his pain. (Id.) Dr. Atkin concluded that Plaintiff could occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; stand, walk or sit for six hours in an eight-hour workday; and had a limited ability to push or pull in the lower extremities. (T. 358).

Dr. Atkin further concluded that Plaintiff could frequently balance, kneel, crouch and crawl, and occasionally climb and stoop. (T. 359). Dr. Atkin advised that it was his belief that the symptoms could be attributed to Plaintiff's impairments, that the severity of those symptoms was not disproportionate to his medical condition, and that the effect of those symptoms on function was consistent with the medical evidence. (T. 362).

Asa Kim, M.D., who is an orthopedic surgeon, examined Plaintiff on November 20, 2007, in relation to an insurance claim based upon the motor vehicle accident. (T. 412-423). Dr. Kim noted that Plaintiff's chief complaint was pain in the mid to lower back. (T. 413).

Plaintiff presented to the appointment with a walker. (T. 419). Dr. Kim noted that Plaintiff was "a moderately-obese, alert, oriented, and well-developed gentleman who at times showed some degree of acute distress, especially when he was trying to get up from the sitting position." (Id.) According to Dr. Kim, Plaintiff reported difficulty in standing and rising from a sitting position, and further reported that his pain had remained steady without any improvement since his accident. (T. 413). An examination of the lumbar spine revealed "well-localized tenderness, and Dr. Kim reported that, "[d]espite [Plaintiff's] subjective complaint of pain, there was no palpable or visible muscle spasm." (T. 420).

Although Dr. Kim agreed with the assessment of Plaintiff's treating physicians and the course of his treatment generally, based on the details of the accident and his own observations, Dr. Kim concluded that the severity of Plaintiff's pain was striking. (T. 421). Dr. Kim opined that the "magnitude of [Plaintiff's] pain and the duration of the pain . . . had certainly exceeded and gone over the anticipated course of progress" of his injury. (T. 421-422). Dr. Kim concluded that Plaintiff "would be fully capable of returning to his work . . . [and] returning to

full activities of daily living without any limitations." (T. 422-423). Dr. Kim further advised that, in his opinion, Plaintiff had had sufficient time to heal, and that he would not require any additional treatment. (T. 423).

In a letter dated December 1, 2008, Dr. Bettich stated that Plaintiff had experienced "unrelenting pain" since his accident, and that he continued to have significant pain requiring anti-inflammatories and frequent use of narcotic pain medications. (T. 424). Dr. Bettich opined that Plaintiff had been unable to return to work, and that he had "significant loss of function in his ability to stand, bend, twist, reach, and ambulate." (Id.) Dr. Bettich stated that in his opinion, Plaintiff was permanently disabled. (Id.)

## V.     HEARING TESTIMONY

At the hearing, Plaintiff testified that he was unable to work due to his pain and the medication he takes, which prevent him from completing a full, eight-hour workday. (T. 29). Plaintiff explained that the pain he experiences in his lower back is throbbing and stabbing, and that it fluctuates from day to day. (T. 30). He reported that he continued to occasionally use a walker. (T. 36).

Plaintiff also detailed the extent of his daily living activities. According to Plaintiff, he lives on his father's farm, but he has not been able to assist with farm chores since the accident. (T. 31). Plaintiff attends water therapy sessions at the YMCA three days a week. (T. 31-32). After therapy, Plaintiff goes home, eats, and then takes a two hour nap. (T. 32). Plaintiff stated, on "the days I go to therapy, I'm shot." (Id.) Plaintiff testified that he assisted in caring for his three children, and that he assisted with washing dishes, shopping, and carrying in groceries. (T. 32-34). Plaintiff stated that he is unable to walk the entire grocery store without assistance. (T.

34). In the evenings, he watches a little television, and plays cards with his father once a week. (Id.)

He further testified that he generally only sleeps for about four hours before he must get up to walk around. (T. 34-35). Plaintiff stated that he is generally able to attend to his personal care, but he requires the assistance of his wife in putting on his shoes and socks. (T. 35). Plaintiff indicated that he was still taking ibuprofen, a muscle relaxer, and percocet, but his medications prevented him from working because they made him tired. (T. 38). He stated that he is unable to sit for more than an hour and a half; that he could walk no more than two blocks without taking a break; that he could stand unassisted for 15 to 20 minutes; and that he could lift approximately 10 pounds comfortably. (T. 38-39).

Next, Karl Botterbusch testified as a vocational expert (VE). (T. 41-44). The ALJ posed the following hypothetical to the VE:

> "We have an individual who is currently age 43, age 42 at the Alleged Onset Date with a limited education. Past work is set forth in your employment analysis. Assuming those facts to be true, I have some hypothetical questions. If a person were limited lifting to 10 – 20 pounds occasionally, 10 frequently. Stand and sit 6 hours each in an 8-hour workday. Walk 2 blocks. No ladder climbing and just occasional stair climbing, balance, stoop, kneel, crouch and crawl."

(T. 42). The ALJ also asked the VE to assume that the individual could occasionally climb stairs, and could frequently be exposed to cold weather extremes. (T. 42-43). The VE concluded that such an individual could not perform Plaintiff's past relevant work. (Id.)

Next, the VE testified that if the hypothetical also required a slight positional change every 30 minutes, Plaintiff could work as an injection molding machine tender, as a photocopy machine operator, and as an office helper, which are light, unskilled work with a sit/stand option.

(T. 43). However, the VE concluded that if Plaintiff required an unscheduled two hour rest break option, he would be rendered incapable of performing a full-time job on a competitive basis. (T. 44). The VE also found that Plaintiff would not be able to retain employment if he missed three or more days of work per month. (T. 44).

## VI.    THE ALJ's DECISION

In rendering his decision, the ALJ applied the sequential, five-step analytical process set forth in the Code of Federal Regulations. See, 20 C.F.R. §§ 404.1520 and 416.920. Under the five-step sequential process, a claimant is disabled only if he is not engaged in substantial gainful activity; he has a severe impairment that significantly limits his ability to perform basic work activities; and his impairment is either presumptively disabling, or he does not have the residual functional capacity to perform his previous work or cannot perform other work existing in the national economy. See, Simmons v. Massanari, 264 F.3d 751, 754-755 (8th Cir. 2001).

The ALJ determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of August 27, 2007. (T. 13). At step two, the ALJ found that Plaintiff's severe impairments were degenerative disc disease and obesity. (Id.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (T. 14). Next, the ALJ concluded that Plaintiff had the following RFC:

> "the claimant has had the residual functional capacity to perform light work with these additional restrictions: he can stand for up to six hours per work day; he can sit for up to six hours per work day; he can walk a maximum of two blocks at a time; he requires a sit/stand option that permits him to change position as frequently as every thirty minutes; he can never climb ladders; he can only occasionally climb stairs, balance, stoop, kneel, crouch or crawl;

and frequently, rather than constantly, be exposed to extremes of
cold."

(Id.)

In reaching this conclusion, the ALJ considered the opinions of the State Agency
Physicians, who concluded that Plaintiff could perform light work." ((Id.)  The ALJ placed some
weight on these opinions, but included some additional restrictions in his RFC.  (Id.)

The ALJ also concluded that the record did not establish the significant limitation
advanced by Dr. Eich, after February of 2008.  (T. 15).    The ALJ found that the record did not
establish "that this extreme degree of limitation lasted twelve or more months," and
consequently, he did not include corresponding limitations in the RFC.  (Id.)  With respect to Dr.
Kim, the ALJ rejected Dr. Kim's opinion to the extent that he concluded that Plaintiff required
no restrictions, which was inconsistent with the evidence establishing that Plaintiff suffered from
two severe impairments, that he had consistently complained of back pain, and that his condition
required some restriction.  (T. 15-16).  The ALJ also declined to give significant weight to the
opinion of Dr. Bettich that Plaintiff was permanently disabled.  (T. 16).  The ALJ noted that Dr.
Bettich is a family physician rather than a specialist, and that the record did not support that his
definition of "disability" was consistent with the Social Security Administration's definition.
(Id.)

The ALJ also found that Plaintiff's level of activity was "inconsistent with his allegation
of disability."  (Id.)  In reaching this conclusion, the ALJ noted that Plaintiff remained fairly
active by assisting in raising his children, which included an infant, and by washing dishes, doing
laundry, shopping, doing physical therapy, and attending to personal hygiene on a regular basis.
(Id.)

The ALJ then concluded that Plaintiff was unable to perform his past relevant work as either a bus driver or bellhop, based upon the testimony of the VE. (T. 17). The ALJ went on to conclude that, based upon Plaintiff's age, education, work experience, and RFC, there were jobs that Plaintiff could perform, which existed in significant numbers in the national economy. (Id.) The VE had testified that an individual with an RFC and profile matching Plaintiff's would be able to perform the requirements of the representative occupations of office helper (1,800 jobs in Minnesota and 100,000 nationally), copy machine operator (2,300 jobs in Minnesota and 87,000 nationally), and injection mold machine operator (4,900 jobs in Minnesota and 147,000 jobs nationally), which exist in significant numbers in the economy. (T. 17-18).

## VII.    STANDARD OF REVIEW

The Commissioner's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the record as a whole. See, Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002); Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998). As the Court of Appeals has repeatedly stated, "'the substantial evidence in the record as a whole' standard is not synonymous with the less rigorous 'substantial evidence' standard." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). Rather,

> "'Substantial evidence' is merely such 'relevant evidence that a reasonable mind might accept as adequate to support a conclusion.' 'Substantial evidence on the record as a whole,' however, requires a more scrutinizing analysis. In the review of an administrative decision, 'the substantiality of evidence must take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."

Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009), quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989). Substantial evidence "is less than a preponderance, but is enough that a

reasonable mind would find it adequate to support the Commissioner's conclusion." Cox v. Barnhart, 471 F.3d 902, 906 (8th Cir. 2006). In reviewing the Commissioner's decision, "we do not substitute our own view of the evidence for that of the Commissioner . . . [and] [w]hether the record supports a contrary result or whether we might decide the facts differently is immaterial." Tellez v. Barnghart, 403 F.3d 953, 956 (8th Cir. 2005)[internal citation omitted]. Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.'" Vandenboom v. Barnhart, 421 F.3d 745, 749 (8th Cir. 2005), quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004); Haley v. Massanari, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, . . . or 'because we would have decided the case differently'").

## VIII.  DISCUSSION

In his motion for summary judgment, Plaintiff argues that the ALJ's decision was not supported by substantial evidence because the ALJ did not give controlling weight to the opinions of Plaintiff's treating physicians, and because he improperly concluded that Plaintiff had the RFC to perform work activities on a regular and continuing basis.  (Pl.'s Memo. in Supp., Dkt. 10, at pp. 8-13).

The Court begins by reviewing the ALJ's RFC assessment.  In opposition, the Commissioner argues that the ALJ properly assessed Plaintiff's RFC, and that he did not err in

disregarding Plaintiff's subjective allegations of disabling pain. (Def.'s Memo. in Supp., Dkt. 12, at pp. 13-15).

Before an ALJ determines a claimant's RFC, "the ALJ must determine the applicant's credibility, as his subjective complaints play a role in assessing his RFC." Ellis v. Barnhart, 392 F.3d 988, 995-96 (8th Cir. 2005), citing Pearsall v. Massanari, 274 F.3d 1211, 1217-18 (8th Cir. 2001). Pursuant to Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984), in assessing a claimant's subjective complaints, an ALJ must consider (1) the claimant's daily living activities, (2) the duration, frequency and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness and side effects of medication, (5) and functional restrictions. See also, Travis v. Astrue, 477 F.3d 1037, 1042 (8th Cir. 2007). "We uphold an ALJ's credibility findings, so long as they are adequately explained and supported." Choate v. Barnhart, 457 F.3d 865, 871 (8th Cir. 2006), citing Ellis, 392 F.3d at 996.

In formulating Plaintiff's RFC, the ALJ concluded that Plaintiff's subjective allegations regarding the severity of his symptoms were not entirely credible. The ALJ acknowledged his duty to evaluate the evidence relating to subjective complaints according to the requirements set forth in Polaski. The ALJ then considered Plaintiff's daily living activities, concluding that Plaintiff was "fairly active." (T. 16). He noted that Plaintiff assisted in raising his children including his infant daughter; that he was able to do laundry; that he attended physical therapy three times weekly; that he washed dishes and shopped regularly; and that he was able to attend to his personal hygiene. (Id.) Based on this evidence, the ALJ concluded that Plaintiff's level of activity was inconsistent with his allegation of disability. (Id.) The ALJ also found that Plaintiff's credibility was undermined by his use of prescription medications because the record "does not suggest that he fails to receive significant relief of symptoms with the use of

medication." (Id.) From these findings, the ALJ concluded that Plaintiff's allegations of disabling pain were not entirely credible. However, the Court finds material inaccuracies and an incomplete analysis in this determination by the ALJ, and accordingly, it finds that a remand is therefore necessary.[1]

With respect to Plaintiff's daily living activities, the Court recognizes that the extent and nature of daily living activities can diminish a claimant's credibility. See, Tellez, 403 F.3d at 957. However, a review of the evidence, and particularly Plaintiff's testimony, shows that the quality, extent, and independence of Plaintiff's daily living activities does not support the ALJ's conclusion that his daily living activities are inconsistent with an allegation of disability. "In evaluating a claimant's RFC, consideration should be given to the quality of daily activities and the ability to sustain activities . . . **over a period of time** and the frequency, appropriateness, and independence of the activities must be considered." Leckenby v. Astrue, 487 F.3d 626, 634 (8th Cir. 2007)[citation and quotations omitted] (rejecting ALJ's conclusion that daily living activities were inconsistent with disability since the evidence consistently demonstrated that claimant had notable limitations and often required significant assistance in performing these activities). In the present case, the evidence suggests that Plaintiff did not perform all of these activities on a regular basis, and that when he did, he was only able to perform the activities identified by the ALJ if he rested or had significant assistance. As such, the Court finds that the ALJ's conclusion

---

[1] The Commissioner has made arguments in support of the ALJ's credibility determination that were not discussed or relied on by the ALJ in disregarding Plaintiff's subjective allegations. Among these arguments is the lack of objective medical evidence in support of Plaintiff's subjective allegations; his conservative course of treatment; and his failure to comply with treatment recommendations. (See, Def.'s Memo. in Supp., Dkt. 12, at pp. 13-15). The evidence cited in support of these arguments is not persuasive. In any event, the ALJ did not draw such conclusions from the evidence, and the Court will therefore not consider them in reviewing the ALJ's credibility determination.

that Plaintiff's daily living activities are inconsistent with a claim of disability is not supported by substantial evidence on the record as a whole.

The Court is particularly troubled by the ALJ's inaccurate characterization of the evidence in the record. For instance, although Plaintiff acknowledged assisting his wife with childcare (T. 32-33), the limited extent of Plaintiff's assistance does not appear to contradict a claim of disabling pain. While he helped feed his infant daughter, who weighed approximately 27 to 28 pounds at the time, Plaintiff also testified that it was uncomfortable to lift his daughter and he immediately puts her on his lap after picking her up. (T. 33). Moreover, Plaintiff testified that although he occasionally assists with some housework, his wife **usually** does the household chores, including cooking meals and washing dishes. (T. 33). When Plaintiff **did** do the dishes, which involves rinsing and placing the dishes in the dishwasher, he is often unable to do them all at once and must take breaks before finishing. (Id.) In addition, Plaintiff testified that his wife does "the majority" of the shopping, but he sometimes goes along in order "to get out of the house." (T. 33-34). At the store, Plaintiff uses a motor cart because he cannot walk through the store unassisted. (T. 34). He acknowledged that he helped carry in the groceries. (T. 34). However, he also stated that he only carries light items and that he rests in the middle of the task.

Moreover, with respect to his personal care, Plaintiff testified that he has to lean against the wall when showering, and significantly, that he is unable to put on his own shoes and socks without assistance. (T. 35). Notably, the ALJ also relied upon the fact that Plaintiff attended water therapy sessions three times weekly as evidence that his complaints are not entirely credible. (T. 32). However, the ALJ fails to even acknowledge that Plaintiff testified that he is wiped out after these sessions and requires a 2 hour nap to recover. (Id.) The water therapy was

simply an effort to retain some of the limited reduction in pain he realized through earlier participation in a skilled physical therapy program; it was not a social activity nor was it a cure for the pain identified in the record.

While the ALJ noted that Plaintiff engaged in these activities, he did not accurately describe the functional limitations that Plaintiff described in connection with the performance of these activities. While Plaintiff may have been able to engage in the activities identified by the ALJ, the evidence in the record as a whole shows that he did so with significant restriction and not on a consistent or continuing basis. Insofar as the ALJ relied on Plaintiff's daily activities as inconsistent with a claim of disabling pain, "the ALJ did not indicate how these minor activities were inconsistent with [the plaintiff's] allegations of disabling pain or were consistent with his ability to engage in light work." Rainey v. Department of Health and Human Services, 48 F.3d 292, 293 (8th Cir. 1995)(noting that ALJ merely stated that plaintiff's daily activities including doing the dishes and light cooking; reading and watching television; visiting his mother when he got a ride; and driving to shop for groceries, but did not explain how these limited activities were inconsistent with allegations of disabling pain); see also, Cline v. Sullivan, 939 F.2d 560, 566 (8th Cir. 1991)(the "functional restrictions experienced by appellant leads to the conclusion that her daily activities are entirely consistent with her allegations of pain," where plaintiff needed assistance with personal care, had difficulty driving, experienced pain when preparing meals, and did not engage in any other activity that was "even remotely strenuous").

While daily living activities may be relevant in evaluating a claimant's ability to work, it is well-settled that "a claimant need not prove she is bedridden or completely helpless to be found disabled." Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989)[citing cases] (the ability to do light housework, attend church, and visit with friends does not qualify as an ability to do

substantial gainful activity). Significantly, in order for a claimant to have the RFC to perform a certain type of work, "the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Draper v. Barnhart, 425 F.3d 1127, 1131 (8th Cir. 2005), quoting Thomas, 876 F.2d at 669. Moreover, the Eighth Circuit "has repeatedly observed that the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work."' Burress v. Apfel, 141 F.3d at 881 [citation and quotations omitted]; Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007)("This court has repeatedly stated that a person's ability to engage in personal activities such as cooking, cleaning or a hobby does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity."), quoting Singh v. Apfel, 222 F.3d 448, 453 (8th Cir. 2000).

Here, the ALJ's failure to address the significant restrictions that Plaintiff testified to regarding his limited engagement in some life activities undermines his conclusion that Plaintiff's level of activity contradicted his subjective allegations of disabling pain. See, Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005)(finding no inconsistency between plaintiff' ability to engage in certain activities, given the "limitations of her ability to perform many of these activities alluded to but not explained by the ALJ"). In light of the ALJ's failure to address Plaintiff's asserted limitations in conducting his daily living activities, the ALJ's conclusion that Plaintiff's "level of activity is inconsistent with his allegation of disability" cannot be credited by this Court.[2]

---

[2]       Insofar as the ALJ may have disbelieved that Plaintiff's level of activity was as severely limited as he actually indicated, that conclusion also should have been adequately explained and

Next, in making his credibility determination, the ALJ considered whether the dosage, effectiveness, and side effects of Plaintiff's medication were consistent with his subjective allegations. The ALJ concluded that the evidence "did not suggest that [Plaintiff] fails to receive significant relief of symptoms with the use of medication." (T. 16). The Court is not aware that any of Plaintiff's doctors ever reported that Plaintiff experienced "significant relief" from his use of medications. Indeed, in support of his conclusion, the ALJ has merely listed the medications used by Plaintiff, but he has failed to cite any evidence supporting that Plaintiff's medications actually provided him significant relief. The Court is unable to understand how a listing of the medications Plaintiff uses supports the ALJ's conclusion, given the absence of any supporting explanation. Notably, Plaintiff's medical records show that he used several forms of medications, including anti-inflammatories, narcotics, and muscle relaxers. While Plaintiff's medical records show that he received some limited relief from the pain medications he took, otherwise he presumably wouldn't have taken them, there is little to support the ALJ's conclusion that he experienced "significant relief."

Rather, records show that Plaintiff consistently sought medical treatment for his chronic pain and that he tried different forms of treatment as well as different medications. At one point, he underwent a thoracic epidural, which Plaintiff was unable to tolerate due to an adverse reaction. (T. 275, 389). In addition, a surgical intervention was considered, but Plaintiff was not considered a good candidate. Plaintiff continued with physical therapy and used a TENS unit. Moreover, Plaintiff attempted to discontinue narcotics and muscle relaxers without any success. (T. 275); (T. 393)(patient "has tried to get by only on ibuprofen, but then has markedly increased

supported. However, the ALJ did not state that he found Plaintiff's testimony regarding the limited nature and extent of his daily living activities not credible.

pain"); (T. 396)(patient "has tried reducing his medication . . . but he cannot function without it").

The Court acknowledges that an impairment that can be controlled by treatment does not support a finding of disability, but in this case, the ALJ failed to explain how Plaintiff's medication use was either significantly controlling his impairment or inconsistent with the record evidence of disabling pain. Cf., Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997)(ALJ disregarded claimant's subjective complaints because respiratory problems could be controlled by smoking cessation and her failure to use pain medication was inconsistent with allegations of disabling pain). Significantly, the ALJ did not cite to any evidence supporting the conclusion that Plaintiff's condition was controlled by medication, or that he was able to resume a normal or significantly less restrictive level of activity as a result of his medication use. See, Bowman v. Barnhart, 310 F.3d 1080, 1084 (8th Cir. 2002)(finding no evidence that medications alleviated her pain, swelling, and depression to the point she would be able to return to work); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)(medical treatment was not inconsistent with allegations of disability where record established that claimant made numerous visits to the doctor; that she used numerous prescription medications; and that she used many pain treatment modalities, which included a TENS unit, physical therapy, and injections). Moreover, as argued by Plaintiff, the ALJ failed to mention or evaluate Plaintiff's claim that the fatigue he experienced as a side effect to his medication use was interfering with his ability to work. (T. 29).

As a consequence, the Court is unable to credit the ALJ's unsupported conclusion that Plaintiff's condition was significantly controlled by the use of pain medications. None of his treating physicians stated that his use of pain medication significantly alleviated his symptoms,

and Plaintiff's own representations of his limited and restricted daily living activities suggest that he continued to experience significant functional limitations, notwithstanding his use of pain medications.

In sum, the Court concludes that the ALJ failed to provide adequate reasons for discounting Plaintiff's subjective allegations with respect to his ability to work on a regular, continuing basis in a competitive workplace. As discussed, the ALJ did not fairly or accurately describe the nature and extent of Plaintiff's daily living activities, which **are not** inconsistent with a claim of disability, as the ALJ concluded based on his inaccurate description of Plaintiff's activities. Notably, Plaintiff reported significant limitations in his ability to perform activities without assistance and without taking breaks. In addition, the ALJ's conclusion that Plaintiff received significant relief from his medication was not supported by evidence in the record. The ALJ did not cite any other evidence to support his conclusion that Plaintiff's subjective complaints were not credible. Accordingly, the ALJ's credibility analysis cannot be sustained by this Court, and therefore, the Court concludes that the ALJ failed to properly evaluate Plaintiff's ability to work on a regular and continuing basis, as is required to support a finding that he is not disabled.

As noted, in order to be considered **not** disabled, a claimant must be capable of performing work activities on a **regular and continuing basis** (i.e. eight hours day, five days a week). An RFC assessment must be based on the record as a whole. See, Dykes v. Apfel, 223 F.3d 865, 866-67 (8th Cir. 2000)(although some medical evidence must support an RFC assessment, the "regulations make clear that residual functional capacity is a determination based upon all the record evidence). This requires that an ALJ take into account "an individual's own

description of [his] limitations." Reed, 399 F.3d at 922, quoting McGeorge v. Barnhart, 321 F.3d 766, 768 (8th Cir. 2003).

In the present case, the ALJ's RFC determination was based on the testimony of a vocational expert. However, "[t]estimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question." Tucker v. Barnhart, 363 F.3d 781, 784 (8th Cir. 2004), citing Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996). "The hypothetical question must include all the claimant's impairments supported by substantial evidence in the record as a whole." Grissom v. Barnhart, 416 F.3d at 837. Here, the ALJ formulated a hypothetical question without directly or adequately addressing Plaintiff's limited ability to regularly and continuously perform work activities without assistance or significant accommodations, as a result of his failure to conduct a proper credibility analysis. See Smith v. Shalala, 31 F.3d 715, 717 (8th Cir. 1994)("In light of the flawed hypothetical, the Secretary has not shown that [the claimant] retains sufficient residual functional capacity to perform gainful activity"); McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982)(RFC is the ability to do the requisite physical acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world" rather than merely intermittently), abrogated on other grounds by, Forney v. Apfel, 524 U.S. 266, 267 (1998); Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008)(in order to constitute substantial evidence that a claimant is not disabled, the testimony of a VE must be in response to a hypothetical question which "captures the concrete consequences of the claimant's deficiencies")[citation omitted]; Swope v. Barnhart, 436 F.3d 1023, 1025 (8th Cir. 2006)(reversing and remanding where ALJ failed "to pose thorough and complete hypothetical questions to vocational experts"); Ledure v. Barnhart, 2003 WL 22283916 at *4 (E.D. Mo. 2003)(remanding for further consideration where the ALJ did not discuss the

claimant's "ability to perform sustained work activities in an ordinary work setting on 'a regular and continuing basis'").  Because the ALJ did not properly evaluate Plaintiff's subjective allegations and his ability to conduct work activities on a regular and continuing basis, "we have no confidence in the reliability of the RFC upon which the ALJ based his decision."  Snead v. Barnhart, 360 F.3d 834, 839 (8th Cir. 2004).

However, while the ALJ's decision contained material inaccuracies and was not properly supported with substantial evidence, the Court finds that further proceedings are required to determine whether Plaintiff is able to work on a regular and continuing basis.  Therefore, the Court finds that a remand is necessary for further consideration of Plaintiff's RFC in light of a proper consideration of his ability to work on a regular and continuing basis.

## IX.   RECOMMENDATION

Based upon the above, and upon all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Defendants' Motion for Summary Judgment [Docket No. 11] be DENIED;

2.    Plaintiff's Motion for Summary Judgment [Docket No. 9] be GRANTED IN PART, for remand for further consideration of whether claimant is entitled to a finding of disability pursuant to sentence four of 42 U.S.C. § 405(g), and DENIED as to an award of benefits.

Dated: January 18, 2011

s/

Leo I. Brisbois
U.S. MAGISTRATE JUDGE

# N O T I C E

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by February 1, 2011,** a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections within fourteen days of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.